B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

**PLAINTIFFS**

Lynne F. Riley, Chapter 7 Trustee

**DEFENDANTS**   J.W. Lindsay Enterprises, Ltd., Patrick F. Lampasona, Jr., Devin T. Hartnell, S. Ernest Porter, Benjamin J. Stokdijk, Cory T. Bell, Kirby J. Putnam, Laurence J. Smith, John C. Kelly, Rykor Concrete & Civil, Inc., American Express Company, Bank of America Corporation, Chase Bank USA, N.A., Steven Hetzel, and Lynn Hetzel

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
A. Davis Whitesell, Lynne F. Riley, and David Koha
Casner & Edwards, LLP, 303 Congress St,
Boston, MA 02210       617-426-5900

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☒ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☒ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Breach of Fiduciary Duty, Fraud and Collusion in Sale Process, Conspiracy to Defraud Creditors, Unjust Enrichment, Fraudulent Transfers (11 U.S.C. s. 544, 548), Preferential Transfers (11 U.S.C. s. 547), Alter Ego/Veil Piercing, Aiding and Abetting, Damages under 11 U.S.C. s. 363(n)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒3 12-Recovery of money/property - §547 preference
☒2 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒1 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23

☐ Check if a jury trial is demanded in complaint | Demand $   Varies by defendant

Other Relief Sought

**B104 (FORM 104) (08/07), Page 2**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR   Lindsay Lampasona, LLC | | BANKRUPTCY CASE NO.   11-19747 | |
| DISTRICT IN WHICH CASE IS PENDING   Massachusetts | | DIVISION OFFICE   Eastern | NAME OF JUDGE   Hon. Joan N. Feeney |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)    /s/ David Koha | | | |
| DATE    October 11, 2013 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)    David Koha | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 104 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br>Lindsay Lampasona, LLC<br>        Debtor | Chapter 7<br>Case No. 11-19747-JNF |

| | |
|---|---|
| Lynne F. Riley, Chapter 7 Trustee,<br>                Plaintiff<br>    v.<br><br>J.W. Lindsay Enterprises, Ltd., Patrick F.<br>Lampasona, Jr., Devin T. Hartnell, S. Ernest<br>Porter, Benjamin J. Stokdijk, Cory T. Bell,<br>Kirby G. Putnam, Laurence J. Smith, John C.<br>Kelly, Rykor Concrete & Civil, Inc.,<br>American Express Company, Bank of<br>America Corporation, Chase Bank USA,<br>N.A., Steven Hetzel, and Lynn Hetzel,<br>                Defendants | Adversary Proceeding<br>No. |

**COMPLAINT**

Lynne F. Riley, Chapter 7 Trustee in the above referenced bankruptcy case,

submits this Complaint against J.W. Lindsay Enterprises, Ltd., Patrick F. Lampasona Jr.,

Devin T. Hartnell, S. Ernest Porter, Benjamin J. Stokdijk, Cory T. Bell, Kirby G. Putnam,

Laurence J. Smith, John C. Kelly, Rykor Concrete & Civil, Inc., American Express

Company, Bank of America Corporation, Chase Bank USA, N.A., Steven Hetzel, and

Lynn Hetzel.  In support of this Complaint, the Trustee states as follows:

<u>**Nature of the Action**</u>

1.      This action involves (i) the acts and omissions of the officers and directors, and

        affiliated entities, of Lindsay Lampasona, LLC, the debtor herein ("Debtor"), with

1

respect to the formation and operation of the Debtor as an undercapitalized

instrumentality of such insiders, (ii) fraudulent and/or preferential transfers to

insiders of the Debtor, and (iii) an improperly-conducted sale of the Debtor's

assets consummated shortly after the Debtor's Chapter 11 filing.  As described in

greater detail below, the Trustee asserts claims for breach of fiduciary duty by the

Debtor's managers/directors,[1] officers, and members, for fraud and unjust

enrichment with respect to the sale process, and for avoidance and recovery of

fraudulent transfers and/or preferential transfers.  The Trustee also seeks to hold

an affiliate/parent of the Debtor liable for the acts and omissions of the Debtor

and its chief executive officer (defendant Hartnell), including under agency and

alter ego theories.  Facts alleged herein are asserted upon information and belief

based upon the Trustee's review of the Debtor's records.

## Parties

2.     Lynne F. Riley is the duly appointed Chapter 7 Trustee of the debtor's estate

("Plaintiff" or "Trustee"), and has a business address of 303 Congress Street,

Boston, Suffolk County, Massachusetts, 02210. The Trustee was duly appointed

as Trustee of the Debtor's bankruptcy estate ("Estate") on May 21, 2012, when

the Debtor's then-pending Chapter 11 case was converted to a case under Chapter

7.  Lindsay Lampasona, LLC ("Debtor") had filed its Chapter 11 case on October

14, 2011 ("Petition Date").

### Management Defendants

3.     The Defendant, Patrick F. Lampasona, Jr. ("PJ Lampasona") is an individual with

---

[1] The Debtor's Statement of Financial affairs uses the term "Director" while the corporate filings use the
term "manager."  Hereafter, the term "manager" shall refer to directors or managers.

2

an address of 393 Union Street, Franklin, MA 02038.

4.      The Defendant, Devin T. Hartnell ("Hartnell") is an individual with an address of

205 Carmel Crescent, Fall River, Nova Scotia, B2T 1H7.

5.      The Defendant, S. Ernest Porter ("Porter"), is an individual with an address of 6

Perth Street, Bedford, Nova Scotia B4A 2G9.

6.      The Defendant, Benjamin J. Stokdijk ("Stokdijk"), is an individual with an

address of 300 Maloney Road, Shubenacadie, Nova Scotia B0N 2H0.

7.      The Defendant, Cory T. Bell ("Bell") is an individual with an address of 215

Phillip Drive, Fall River, Nova Scotia B2T 1H7.

8.      The Defendant, Kirby J. Putnam ("Putnam"), is an individual with an address of

3548 Leaman Street, Halifax, Nova Scotia B3K 3Z7.

9.      The Defendant, Laurence J. Smith ("Smith," and together with Hartnell, Porter,

Stokdijk, Bell and Putnam, the "Canadian Owners"), is an individual with an

address of 2038 Crowell Road, East Lawrencetown, Nova Scotia B2Z 1N9.

**Canadian Affiliate Defendant**

10.     The Defendant, J.W. Lindsay Enterprises, Ltd. ("JWL") is a Limited Company

organized and existing under the laws of Nova Scotia, Canada with a place of

business and registered office located at 22 Fielding Ave, Dartmouth, Nova Scotia

B3B 1E2.

**Additional Collusive Sale Defendants**

11.     The Defendant, John C. Kelly ("Kelly"), is an individual with an address of 425

Canton Ave., Milton, MA 02186.

12.     The Defendant, Rykor Concrete & Civil, Inc. ("Rykor"), is a Delaware

3

corporation with a place of business at 6 Shire Drive, Norfolk, MA 02056.

## Financial Institution Transferee Defendants

13.     The Defendant, American Express Company ("American Express") is a corporation organized and existing under the laws of the State of New York with a place of business located at 200 Vesey Street, New York, NY 10285.

14.     The Defendant, Bank of America Corporation ("BofA") is a corporation organized and existing under the laws of Delaware, with a principal place of business at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255.

15.     The Defendant, Chase Bank USA, N.A. ("Chase") is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 200 White Clay Center Drive, Newark, DE 19711, and is a wholly owned indirect subsidiary of JP Morgan Chase & Co., which has a principal place of business at 270 Park Avenue, New York, NY 10017-2070.

## Additional Insider Transferee Defendants

16.     The Defendant, Steven Hetzel, is an individual with an address of 72 Pine Cone Drive, West Yarmouth, MA 02673.

17.     The Defendant, Lynn Hetzel, is an individual with an address of 72 Pine Cone Drive, West Yarmouth, MA 02673.

## Jurisdiction, Venue and Standing

18.     This Court has jurisdiction over this adversary proceeding as a matter arising under Title 11 pursuant to 28 U.S.C. § 157 and § 1334.  This is a core proceeding pursuant to 28 U.S.C. §157 (b)(2)(A), (F), (H) and (O).

4

19.   Venue of this adversary proceeding is appropriate pursuant to 28 U.S.C. § 1409.

20.   The Trustee has the power and standing to bring this action pursuant to 11 U.S.C.

§§ 363, 541, 542, 544, 547, 548 and 550.

21.   Pursuant to 11 U.S.C. § 541, property of the estate includes any and all rights,

claims and causes of action of the Debtor against third parties, including claims

against its officers, managers and members.

22.   Pursuant to 11 U.S.C. § 544, the Trustee has the right to assert any claims and

causes of action that could have been asserted by unsecured creditors of the

Debtor as of the filing date.

## Facts

### The Debtor's Formation and Undercapitalization

23.   The Debtor is a Delaware Limited Liability Company formed in June 2008 by

principals of  Lindsay Construction, Inc. ("Lindsay"), the U.S.-based arm of a

Canadian construction company, and Lampasona Concrete Corporation ("LCC"),

a Massachusetts-based construction company.

24.   At all times, and as more specifically set forth below, 75% of the Debtor's

member (equity) interests have been owned by the Canadian Owners (or entities

affiliated with them), and the remaining 25 % of such interests have been owned

by PJ Lampasona and his cousin, Tony Lampasona (or entities affiliated with

them).[2]

25.   According to the Debtor's tax returns, Lindsay was the 75% owner of the Debtor

and LCC was the 25% owner.

---

[2] Tony Lampasona and his wife, Margaret Lampasona filed a joint chapter 7 bankruptcy petition on January 31,  2012 in this Court [Case No. 12-10779].  In light of the automatic stay in effect in that case, Plaintiff has not included Tony or Margaret Lampasona as named defendants in this action.

26.     According to the Debtor's Statement of Financial Affairs, the owners of the
Debtor are the Canadian Owners, PJ Lampasona, and Tony Lampasona, with each
of those eight individuals owning an equal 12.5% share of the Debtor's member
interests.

27.     Prior to forming the Debtor, LCC was engaged in the business of construction of
concrete foundations and walls.  PJ Lampasona and Tony Lampasona together
owned 100 percent of the equity interests in LCC, and were also directors and the
principal officers of LCC.

28.     Prior to forming the Debtor, Lindsay was engaged in the business of construction
of tilt-up concrete wall systems and concrete foundations and floors.  The
Canadian Owners, or affiliates of the Canadian Owners, owned, directly or
indirectly, 100 percent of the equity interests in Lindsay, and were also directors
and the principal officers of Lindsay.

29.     The Debtor's members formed the Debtor to pursue the business previously
conducted separately by Lindsay and LCC.  Lindsay and LCC ceased ongoing
business operations incident to, or shortly after, the Debtor's formation and
commencement of business operations.

30.     However, a bank account owned by LCC at the Bank of Canton ("LCC Account")
remained open and was used by the Debtor as its own account.

31.     Additionally, a bank account owned by Lindsay at TD Banknorth ("Lindsay
Account") remained open and was used  by the Debtor as its own account.

32.     Lindsay and LCC and/or their respective principals or affiliates (including JWL)
capitalized the Debtor by contributing to the Debtor, or by permitting the Debtor

to utilize certain of their assets to enable the Debtor to perform work that, absent formation of the Debtor, either of them might have performed itself.

33. Upon information and belief, the Debtor assumed, or otherwise undertook to perform, some or all of Lindsay's and LCC's respective liabilities.

34. Whatever the particulars of the Debtor's initial capitalization, the Debtor was undercapitalized at the time of its formation and at all times thereafter.

35. The Debtor's first tax return, for 2008, disclosed liabilities in excess of assets. Every tax return filed by the Debtor thereafter (2009 and 2010) also disclosed liabilities in excess of assets.

36. Moreover, the balance sheets contained in the tax returns, and other balance sheets provided by the Debtor to third parties, did not disclose a $1,000,000 maxed out line of credit owed by LCC to the Bank of Canton ("$1m Line of Credit"). Lindsay, LCC and the Debtor considered the $1m Line of Credit to be the Debtor's obligation from the outset of the Debtor's formation. By no later than April 2009, the Debtor contractually obligated itself to pay the $1m Line of Credit.

37. The Debtor's officers and directors were aware that the $1m Line of Credit should have been included as a liability on the Debtor's balance sheet by no later than April 2009.

38. The balance sheets also included overstated assets, including a "prepaid rent receivable" from Vindome, LLC ("Vindome"), the Debtor's landlord, which was owned and controlled by PJ and Tony Lampasona. The Debtor paid rent to Vindome.

7

39.     Soon after its formation in June 2008, the Debtor began experiencing difficulty

        paying its critical vendors, payroll, and insurance.

40.     From and after the time of its formation, the Debtor generally did not pay its bills

        as they became due.

41.     By March 2009 at the latest, near the time that the Debtor contractually obligated

        itself to pay the $1m Line of Credit, the Debtor  began bouncing payroll checks.

42.     In June 2009, Hartnell emailed Tony and PJ Lampasona to discuss the Debtor's

        "overwhelming" debt burden.  He stated, "the debt of this company will be the

        eventual item that kills us if we don't dig out of it."

43.     The Debtor continued to experience difficulty paying its bills until the bankruptcy

        filing in October 2011.

**The Debtor's Receipt of Capital Infusions From Insiders**

44.     The Debtor received initial infusions of capital from JWL in the amount of

        $567,487.65.

45.     Nevertheless, the Debtor was undercapitalized at its formation, necessitating

        subsequent infusions of capital from insiders, including:

        a.     Ongoing advances from JWL totaling at least $652,386.27, bringing

               JWL's total capital infusions in the Debtor to at least $1,219,873.92

               ("JWL Advances");

        b.     a $150,000 advance, on or about July 16, 2009, from Mary Lampasona,

               the Debtor's controller and mother of PJ Lampasona ("Mary Lampasona

               Advance");

        c.     a $100,000 advance, on or about July 16, 2009, from Hartnell ("Hartnell

8

Advance");

    d.   Ongoing advances from Tony Lampasona and/or his wife, Margaret

Lampasona, in the form of payments for the Debtor's business expenses

charged to their personal credit card(s).

    e.   Ongoing advances from Hartnell which took the form of payments for

business expenses that were charged to Hartnell's personal credit card(s).

46.   Despite these infusions of capital, the Debtor remained insolvent and was

chronically short of cash and unable to pay all of its bills as they became due.

**The Canadian Owners' Affiliates, and Their Relationships With the Debtor.**

47.   The Canadian Owners, or entities affiliated with the Canadian Owners, own

directly or indirectly 100 percent of the equity interests in JWL.[3]

48.   From and after the time that the Debtor commenced business operations, JWL

asserted control over many aspects of the Debtor's business. JWL considered the

Debtor to be its foreign (U.S.-based) operating division.

49.   At all relevant times, the Debtor's managers were the Canadian Owners, PJ

Lampasona, and Tony Lampasona.

50.   At all relevant times, Hartnell was the Debtor's CEO, Tony Lampasona was the

Debtor's President, and PJ Lampasona was the Debtor's Vice President.

51.   Each of the Canadian Owners is a manager or director of JWL.

52.   JWL's officers are Bell (President), Porter (Chairman), Putnam (Executive Vice

President), Smith (Vice President, Engineering), Stokdijk (Senior Vice President,

Operations), and Hartnell (Vice President, Operations).

---

[3] The ultimate owners of J.W. Lindsay and Lindsay are six family trusts affiliated with (if not controlled by) the Canadian Owners.  An organization chart summarizing ownership of JWL and Lindsay from the Debtor's records is attached as **Exhibit A**.

53.    Hartnell undertook his role as CEO of the Debtor on behalf of, and in furtherance of the interests of, JWL.  Indeed, JWL's website  informs that Hartnell "transitioned to CEO of our New England offices during 2007-2010 and recently returned to Atlantic Canada to fulfill the role of Senior Project Manager and Vice President of Operations."

54.    The Debtor's Statement of Financial Affairs, Item 3C, identifies JWL as the Debtor's "Parent Company."

55.    Hartnell stated in an email that the Debtor was essentially a division of Lindsay and that "it's all one company."

56.    On numerous occasions, Hartnell and Bell referred to the Debtor  as the "US operations" of JWL.

57.    On numerous occasions, JWL's employees or officers performed work for the Debtor although they were not employed by the Debtor or paid a salary by the Debtor.

58.    JWL directly paid numerous expenses of the Debtor, including the salary of one of the Debtor's superintendents.

59.    JWL repaid an advance Hartnell had made to the Debtor.

60.    On April 29, 2011, Bell signed a letter on behalf of JWL in support of the Debtor's bid on a project where Hardin Construction was the general contractor. Bell stated, "Lindsay Construction holds 75% interest in Lindsay Lampasona. This ownership makes us financially responsible for the Hardin Project.  As such we will ensure that all obligations are met accordingly."

**Payments to or for the Benefit of Insiders**

10

61.  Despite the Debtor's undercapitalization and inability to pay vendors and meet payroll, the Debtor's owners, directors and officers caused the Debtor to disburse substantial sums to or for the benefit of insiders of the Debtor, including JWL, Hartnell, PJ Lampasona, Tony Lampasona, Margaret Lampasona, Mary Lampasona, the Hetzels, and certain favored vendors.

### a.  The Hetzel Payment

62.  Soon after its formation, on or about July 18, 2008, the Debtor paid $252,000 to Defendants Steven and Lynn Hetzel ("Hetzel Payment").

63.  The Debtor had no obligation to make the Hetzel Payment.

64.  Steven and Lynn Hetzel (the "Hetzels") are the stepfather and mother of Tony Lampasona.

65.  The Hetzel Payment was made on account of a promissory note in the amount of $252,000 from PJ and Tony Lampasona to the Hetzels dated May 12, 2006 ("Hetzel Promissory Note").

66.  The Hetzel Promissory Note was executed by PJ and Tony Lampasona as consideration for an advance made by the Hetzels to PJ and Tony Lampasona for use in their various business enterprises, including LCC.

67.  Entities controlled by PJ and Tony Lampasona, including LCC and Vindome, LLC ("Vindome") made interest payments to the Hetzels.

68.  The terms of the Hetzel Promissory Note did not include a fixed maturity date.

69.  The Hetzel Promissory Note provided: "Principal amounts shall be repaid at any time and in any amounts totaling $252,000 over the life of the loan.  It is the intention of the parties to repay these amounts as soon as possible, with best

11

efforts to do so within one year."

**b.  The Credit Card Payments**

70.    The Debtor's principals caused the Debtor to pay the personal credit cards of

Margaret Lampasona, Tony Lampasona, PJ Lampasona, and/or Hartnell.

71.    The charges on the personal cards included the advances, discussed above, for

business expenses of the Debtor, as well as substantial personal charges.

72.    Additionally, Margaret Lampasona, Tony Lampasona, PJ Lampasona, and/or

Hartnell charged personal expenses to credit cards which were held in the name of

the Debtor and/or LCC, and the related credit card bills were subsequently paid by

the Debtor.

73.    Within the four years prior to the Petition Date, the Debtor made at least 21

payments to American Express on various cards totaling at least $48,751.36

("Amex Transfers"). A list of the Amex Transfers with check numbers and

payment dates is attached as **Exhibit B.**

74.    The Amex Transfers were on account of charges incurred by insiders of the

Debtor on personal cards and/or on cards held in the Debtor's name but used for

personal charges.

75.    The Debtor had no obligation to make the Amex Transfers and/or these insiders

wrongfully made personal charges related to such transfers.

76.    Within four years prior to the Petition Date, the Debtor made at least 178 transfers

to Bank of America on various cards totaling at least $94,724.90 ("BofA

Transfers").  A list of the BofA Transfers with check numbers and payment dates

is attached hereto as **Exhibit C.**

12

77.    The BofA Transfers were on account of charges incurred by insiders of the
Debtor on personal cards and/or on cards held in the Debtor's name.

78.    The Debtor had no obligation to make the BofA Transfers and/or these insiders
wrongfully made personal charges related to such transfers.

79.    On or about August 8, 2008, the Debtor made a payment of $11,681.05 to Chase
Card Services on a card held in Margaret Lampasona's name, by check from a
Bank of Canton account ending in 0695, check number 9984 ("Chase Transfer").

80.    Within four years prior to the Petition Date, the Debtor made at least 20 transfers
to the Norfolk Community Federal Credit Union on a card held in Hartnell's
name totaling at least $42,936.54 ("NCFCU Transfers).  A list of the NCFCU
Transfers is attached hereto as **Exhibit D.**

**c. The Payments to JWL**

81.    During the four years prior to the Petition Date, the Debtor paid at least
$159,712.79 to JWL ("JWL Transfers").

82.    A list of the JWL Transfers is attached hereto as **Exhibit E.**

83.    The JWL Transfers were purportedly interest or principal payments on
promissory notes from the Debtor to JWL ("JWL Promissory Notes"), which the
Debtor purportedly executed in exchange for the JWL Advances.

84.    Originally, five promissory notes were executed between June 30, 2008 and May
20, 2009 in the total principal amount of $1,171,312.00 ("Old Notes").

85.    Some or all of the Old Notes were executed after the related funds had been
advanced.

86.    Although the Old Notes provided for the payment of interest, the Debtor did not

make regular interest payments.  The minutes for the Debtor's 2009 "First Quarter

Directors' Meeting"[4] indicate that the managers discussed "the three JWL

intercompany Notes that were amended and signed in late December totaling

about $1.02 million."  The minutes state that with respect to these notes, "Accrued

interest will be posted monthly to the outstanding Note balances until such time as

the company can begin paying the installments in cash."

87.     In an email to Thomas Jackson,[5] the Debtor's CFO,  Hartnell stated, "I met with

the group last week and have discussed how we are going to start making

payments back to them." The "group" is the directors/officers of JWL.

88.     The Jackson email includes an attachment of two unexecuted notes, totaling

$150,000, which related to funds that were advanced to the Debtor  several

months prior.

89.     Hartnell states that "we never officially signed paper on them" and "we still

obviously owe the entire balance back." He further stated, "we can discuss if/how

this appears on our current financials and we likely should sign the notes as Anne

has attached."

90.     Sometime in 2010 the Debtor executed two new promissory notes ("New Notes")

to replace the Old Notes.  The Debtor postdated the New Notes for November 1,

2009.

91.     The New Notes totaled $1,171,312.00, the same amount as the purported

principal amount of the Old Notes.

---

[4] The minutes also state, "This being the first Directors' Meeting since company formation, there was no
Old Business and no previous Minutes to review."

[5] The email was printed out, with no date, and placed in the Debtor's paper files.  The email appears to have
been deleted from the Debtor's records.  The context suggests that the email was sent around September
2009.

92.    At the time of the execution of the New Notes, JWL forgave all outstanding interest on the Old Notes.

93.    One of the New Notes was for $840,000 ("840K Note") and it required 84 equal monthly installments of $10,000.  It did not provide for the payment of interest unless any payment was more than 60 days late.

94.    The other New Note was for $331,312, and it allowed for payment as permitted by the Debtor's cash flow, but would be due in full by July 1, 2015 or upon demand by JWL.

95.    The Debtor rarely made timely payments to JWL on the 840K Note and JWL never charged interest for late payments.

96.    The Debtor and JWL treated the JWL Advances as equity internally, but sought to create a façade of long term debt to ensure priority for JWL in the event of the Debtor's financial unraveling and to satisfy JWL's auditors and bonding company.

97.    JWL gave the Debtor almost complete flexibility in making payments on the JWL Promissory Notes, except when there was a risk that JWL's auditors or bonding company would raise issues with respect to nonpayment of the Promissory Notes.

98.    On the occasions when JWL was being audited, JWL would request that the Debtor send payments on account of the notes so that JWL could show the checks to the auditors, but without the intention of actually cashing the checks – at least until the Debtor could afford payment on the checks.

99.    In a September 15, 2010 email, Hartnell discussed the JWL Advances and stated that although "proper accounting principles force us to put it as debt," the

15

obligation to pay back the advances was "out of profits and is flexible" and "our

bank considers this to be equity."

100.   On October 6, 2010, Hartnell emailed Mary Lampasona, the Debtor's office

manager, urgently requesting that she send three checks for $10,000 each to JWL

for the May, June and July 2010 monthly payments on the $840K Note.

101.   The request for payment from JWL was motivated by a note from their auditors

on their audited statements that no payments had been received on the New Notes.

102.   Hartnell stated, "they need to get this taken off or it will be dire for them with

their bonding company."  He requested that she overnight the checks to Bell so

that he could show them to the auditors.

103.   He stated, "we need to do this check up monthly as if it were a regular note

payment to anybody else."

104.   However, the Debtor never made regular note payments on the Old Notes or the

New Notes.

105.   PJ Lampasona testified that JWL lent money to the Debtor "with the intent of

paying [JWL] back at some point in time."

**d. The Payments to Hartnell**

106.   The Debtor made payments totaling at least $34,489.62 to Hartnell during the four

years prior to the Petition Date ("Hartnell Transfers").  See Hartnell Transfers,

attached hereto as **Exhibit F.**

107.   Some or all of the Hartnell Transfers were made on account of the Hartnell

Advance.

**e. The Payments to PJ Lampasona**

16

108.    The Debtor made payments totaling at least $44,676.86 to PJ Lampasona during

the four years prior to the Petition Date ("PJ Lampasona Transfers"), in addition

to regular salary payments. See list of PJ Lampasona Transfers, attached hereto as

**Exhibit G.**

**f. The Payments to Mary Lampasona**

109.    The Debtor made payments totaling at least $20,334.61 to Mary Lampasona

during the four years prior to the Petition Date ("Mary Lampasona Transfers"), in

addition to regular salary payments. See list of Mary Lampasona Transfers,

attached hereto as **Exhibit H.**

110.    Some or all of the Mary Lampasona Transfers were on account of the Mary

Lampasona Advance.

**g. The Payments to Tony Lampasona**

111.    The Debtor made payments totaling at least $18,623.64 to Tony Lampasona

during the four years prior to the Petition Date ("Tony Lampasona Transfers"), in

addition to regular salary payments. See list of Tony Lampasona Transfers,

attached hereto as **Exhibit I.**

**h. The Payments to Margaret Lampasona**

112.    The Debtor made payments totaling at least $65,238.39 to Margaret Lampasona

during the four years prior to the Petition Date ("Margaret Lampasona

Transfers"), in addition to regular salary payments. See list of Margaret

Lampasona Transfers, attached hereto as **Exhibit J.**

113.    The Debtor paid Margaret Lampasona a regular weekly salary during the 4 years

prior to the Petition Date even though she did not perform services for the Debtor.

17

**Self-Dealing By Insiders on the Eve of the Debtor's Bankruptcy Filing**

114.   By 2011, the chronic undercapitalization and insolvency of the Debtor left the

Debtor in dire financial straits.

115.   The Canadian Owners and  PJ Lampasona knew that the Debtor was in a

precarious financial position.

116.   On January 19, 2011, while attending an industry conference in Las Vegas, Tony

Lampasona sent an email to PJ Lampasona and Hartnell attaching a picture of

himself and Bell in a limousine.  He stated, "Bell and I in our Limo! If we're

going down, we're going down big!"

117.   Soon after the trip to Las Vegas, PJ Lampasona and Tony Lampasona took

equipment owned by the Debtor from the Debtor's garage and moved it to Tony

Lampasona's or his father's own garage.

118.   They did so in order to hide the equipment from the Bank of Canton, which had a

lien on all of the Debtor's assets, and they did so with the intent of converting the

property for their own personal use.

119.   In an email dated March 23, 2011, Tony Lampasona stated to PJ, "I think we

should be thinking about moving some walkers a rider or two and some other

stuff to my garage? The bank could be thinking of calling in the notes in which

case I think they'll come lock the doors and inventory the equipment like they

finally did to Chris Stone."

120.   Tony Lampasona stated that this would allow them to "start back up [and] do

advantages slabs." "Advantages slabs" refers to work that PJ and Tony did for

Advantage Construction, Inc., a company owned by Kelly.

121.    PJ Lampasona agreed with Tony's scheme, stating, "I agree we need to have a a plan like that."  PJ suggested putting the equipment in Tony's father's shop.

122.    Tony replied that they should do this "prob like tomorrow [because] they could call the noted [sic] in and if so they know someone would try to hide/sell equipment… I'll talk to u n the am but we'll move some stuff."

123.    PJ replied, "Maybe over the weekend. Don't need anyone to know."

124.    Tony replied, "Ok me n u over the weekend just that we need a cdl driver… we could prob confide in kevin."

125.    PJ replied, "I can drive the knucle [sic] boom. Just to franklin."  A "knuckle boom" is an excavator or crane.

126.    Tony replied, "Ok let's do it over the weekend only prob is I'll have to tell my dad."

127.    Meanwhile, Hartnell was exploring options whereby JWL and Lindsay would "pull out" of the US operation.  Hartnell considered various options including a chapter 11 bankruptcy filing.  In an email to JWL's attorney, Natalie Woodbury[6], on April 7, 2011, Hartnell stated, "Cory [Bell] and I would like to discuss a couple of things with you in confidence as it relates to our US operation." He stated that he had been advised that the JWL Advances would be "recharacterized by the courts as equity and therefore go down the list of priority."  He stated that "It would be the bank first, secured creditors next, unsecured creditors third (vendors, etc), and then JWL." He stated that he had discussed this issue with a "high priced lawyer on recommendation, so I tend to believe what he was saying, but I couldn't push the issue to [sic] hard as I was there with Tony and PJ."

---

[6] The email was sent using the Debtor's email system.

128. In the email, Hartnell asked for advice regarding how to get the maximum repayment for JWL. He stated, "we are looking at all options, and we want to figure out if we were to pull out, what is the best option to get our money (or as much as possible which may be substantially less) out."

129. Soon thereafter, Bell and Hartnell discussed methods of making concealed payments from the Debtor to JWL on account of JWL's $1.2 million in advances to the Debtor.

130. In an April 19, 2011 email to Bell, Hartnell states, "I was thinking maybe a way to ensure more money back it [sic] to try and opt into their program, control the contract, and each monthly req take our 10K off the top. That would ensure another 150K or so thru the duration of the project."

131. Bell responded, "That can work… why don't we send them our info with the stipulation that it runs through the shell company in the US with a guarantee from Canada."

132. He subsequently stated that he wanted to speak with "Stuart… regarding the 1.2 mill and what if anything we can do to offset our losses."

133. Thus, in the spring of 2011, while Tony and PJ Lampasona were conspiring to misappropriate the Debtor's assets, the Canadian Owners were conspiring to obtain maximum repayment on the JWL Advances, which they understood to be lower in priority than the Debtor's unsecured debts.

134. Moreover, in the spring, summer and fall of 2011, leading up the bankruptcy filing in October, the Debtor's principals spent considerable time and energy arranging for the secret repayment of various insiders. As a result, tens of

20

thousands of dollars were paid to insiders even when it was known that the

company would fail.

135.   In an email dated July 31, 2011, Tony Lampasona stated to Hartnell and PJ

Lampasona,

> "it would be nice of [sic] we could pay off some or all of
> Margarets card… we're getting down to the end now and the bank
> doesn't have complete control of our accounts "yet" its easy
> enough to make this look like current job cost… if we don't pay
> that and or Devins cc's this pay cycle its just not gonna happen.
> I've agreed to everything thus far ie.. Paying Devins cards…
> paying Mary back etc…. Devin's 100K will be paid, Mary and
> Pats 150k will be paid the bank somehow will be made whole
> perhaps with the foreclosure of my house; point is our credit card
> debt as I see it is the only personal $ that's not working out easily.
> While I work through everything else and settle all the debt I need
> to be looking after getting Margarets cards paid… [I] didn't want
> to seem selfish but its [sic] the end of the line and I need to look
> after this."  (emphasis added).

136.   Hartnell and PJ Lampasona responded positively to Tony's plan. Indeed, Hartnell,

PJ and Tony discussed selling a piece of equipment owned by the Debtor to pay

off some of Tony's and/or Margaret's credit cards and then to "make a plan for

the balance," including direct payment to Tony from one of the Debtor's

contracts.  Hartnell stated to Tony: "I think PJ spoke to you about Currie paying

you directly for that job to knock this down as well."

137.   Hartnell and Bell continued to seek methods of obtaining payment from the

Debtor.  In an August 18, 2011 email from Hartnell to Mary Lampasona, Hartnell

requested that Mary Lampasona reverse journal entries for three $10,000 checks

the Debtor had written, and apparently sent, to JWL.  He stated that he would later

have JWL deposit them "if we get to a point where I think we could get them

through at the bank."  By this point, the Debtor's principals had agreed to sell the

21

Debtor's assets and Hartnell had agreed to resume his employment with JWL as Vice President of Operations.

138. Despite Bell and Hartnell's positions as managers of the Debtor, they acted to advance JWL's interests to the detriment of the Debtor's creditors.

139. Despite their positions as officers of the Debtor, PJ and Tony Lampasona acted in their own self-interest to the detriment of the Debtor's creditors.

**Improprieties In The Sale of the Debtor's Assets to Rykor**

140. At some point in the spring of 2011, PJ and Tony Lampasona contacted Kelly with regard to the sale of some or all of the Debtor's assets.

141. PJ and Tony Lampasona had a long-standing relationship with Kelly. Their businesses had done work together for years. They were also personal friends.

142. Indeed, when PJ and Tony discussed illegally misappropriating the Debtor's encumbered assets for their own use, they did so with the intention of working with Kelly's company, Advantage Construction.

143. In the spring of 2011 discussion began between PJ and Tony Lampasona and Kelly regarding sale of the Debtor's assets to a new entity to be created by Kelly.

144. PJ and Tony Lampasona would be employed by the new entity to run its day to day operations. Several other key employees would also be retained.

145. The Lampasonas' discussions with Kelly did not constitute an arm's length negotiation for a sale of the Debtor's assets.

146. Rather, the Lampasonas sought a sale to Kelly as a means of ensuring their continued employment in the Debtor's concrete business, and a means to repay the Mary Lampasona Advance.

147. From the outset, negotiations between the Lampasonas and Kelly involved repayment of the Mary Lampasona Advance as part of the sale.

148. On June 22, 2011, in an email to Bell, Hartnell stated that "John Kelly has crept back into the conversations" and that Tony Lampasona had "screwed us" by telling Kelly "everything that was going on." He stated that Kelly "is now offering to start a new concrete company and purchase whatever assets he needs from us (at below auction prices I'm sure) and hire Tony and PJ to run."

149. Hartnell stated that PJ and Tony Lampasona were "looking after themselves more and more" and that he was "nervous the guys are already starting to monkey with this stuff."

150. Hartnell also stated that PJ was "trying to find ways to pay Mary [Lampasona] which just doesn't work."

151. He acknowledged, "I want to pay her too, but are [sic] hands are tied as we currently sit."

152. With respect to a sale of the Debtor's assets, Hartnell stated that "even the illusion of competition for things would be helpful."

153. Despite Hartnell's reservations concerning the integrity of the sale to Kelly or his nominee, he fully supported PJ and Tony Lampasona's efforts and became directly involved in negotiating and ensuring execution of a sale to Kelly.

154. On July 27, 2011, Kelly emailed Tony and PJ, stating, "Here is the deal." He then laid out the basic terms of a sale of the Debtor's assets to a new company,[7] including a purchase price of $400,000 for the Debtor's tangible assets. The last

---

[7] At this stage of the planning, the new concrete company's name was contemplated as "Ryan Concrete Corp." which was later changed to Rykor.

item on the list was, "We will then still need to address PJ's parents money and

the re-payment of those funds." PJ Lampasona forwarded the email to Hartnell,

and Hartnell forwarded the email to Bell.

155.    Hartnell was instrumental in obtaining a commitment from Kelly to repay the

Mary Lampasona Advance.

156.    Hartnell met with Kelly and discussed the matter with him personally.

157.    Hartnell obtained a firm commitment from Kelly to repay Mary's advance on

August 15, 2011.

158.    Rykor was incorporated by Kelly in Delaware on August 12, 2011. Kelly was its

President, Treasurer and Secretary, and sole director.

159.    Rykor was registered to do business in Massachusetts on August 26, 2011.

160.    Kelly, Hartnell, PJ Lampasona and Tony Lampasona considered the full

repayment of Mary Lampasona to be integral part of the agreement for the

purchase of the Debtor's assets.

161.    According to Hartnell, it was "crystal clear and communicated to all parties" that

the sale included Kelly's repayment of the $150,000 to Mary Lampasona. He

stated, "the purchase price of the assets was set with this in consideration."

Although Kelly did not want to document the agreement, Kelly's promise to pay

was the subject of voluminous email correspondence between Hartnell, PJ

Lampasona, and Mary Lampasona, such as:

- Hartnell informed PJ Lampasona that he "got the confident reassurance

   that it will be looked after" from Kelly.

- PJ Lampasona responded, "Glad you got a commitment."

24

- PJ Lampasona stated to Mary Lampasona, "don't say any thing [sic] but the 150k owed to you is likely to come from john. xo"

- Mary responded, "I wouldn't anyway – but Devin already explained it to me. xo"

- Hartnell stated in an email to Mary Lampasona that Kelly's agreement to pay her was "an integral part" of the agreement to sell the Debtor's assets to Rykor.

- Hartnell stated to Mary Lampasona that "the purchase price of the assets was set with [payment of $150,000 to her] in consideration."

162.   Thus, the true purchase price that Kelly was to pay for the Debtor's assets was at least $598,000.  However, only $448,000 was disclosed to the Court and to creditors, with the remainder to be paid to Mary Lampasona outside the bankruptcy sale process.

163.   Hartnell disclosed the nature of the sale negotiations to the other Canadian Owners.

164.   At some point in September or October of 2011, the members and managers of the Debtor, consisting of the Canadian Owners, PJ Lampasona and Tony Lampasona, held a meeting to vote on the sale of the Debtor's assets to Rykor.

165.   The meeting was held at JWL's office in Canada, and PJ Lampasona and Tony Lampasona attended the meeting telephonically.

166.   Hartnell served as secretary of the meeting and kept the notes.

167.   PJ Lampasona and Tony Lampasona did not vote on the sale of the assets to Rykor.

25

168.   The other members of the Debtor (i.e., the Canadian Owners) voted unanimously to approve the sale of the assets to Rykor.[8]

169.   The Canadian Owners knew of PJ and Tony Lampasona's relationship with Kelly.

170.   The Canadian Owners knew of the collusive nature of the sale.

171.   The Canadian Owners knew the artificial nature of the negotiations for the Debtor's sale price.

172.   The Canadian Owners knew that the negotiations with Kelly concerning the sale had been conducted by PJ and Tony Lampasona.

173.   Bell was informed by Hartnell that Tony Lampasona "screwed us" by talking with Kelly and telling him "everything that was going on."

174.   Bell was informed by Hartnell that Kelly had offered "to start a new concrete company and purchase whatever assets he needs from us (at below auction prices I'm sure) and hire Tony and PJ to run."

175.   Bell was informed by Hartnell that he was "nervous" that Tony and PJ were "already starting to monkey with this stuff" and it was clear from the context that Hartnell was referring to Kelly's involvement.

176.   The Canadian Owners knew that part of the sale price was to include repayment the Mary Lampasona Advance.

177.   The Canadian Owners were well aware that Tony and PJ Lampasona were acting in their own self-interest and in the interest of Mary Lampasona.

178.   The Canadian Owners also voted in favor of the sale because it would enable their own companies, JWL and Lindsay Construction, to extricate themselves from the Debtor's business.

---

[8] At that stage of the planning, the name of the entity buying the assets was "Ryco Concrete & Civil Inc."

179.    The Canadian Owners did not act with the Debtor's best interests in mind in voting to approve the sale to Rykor.

180.    At best, the Canadian Owners were extremely negligent in failing to investigate whether the sale was in the Debtor's best interests given information provided to them by Hartnell concerning irregularities in the sale process.

181.    Because the Debtor was insolvent, the Debtor's members', managers' and officers' fiduciary duty extended to the Debtor's creditors.

182.    The Canadian Owners, PJ Lampasona, and Tony Lampasona did not proceed in good faith, and with care and loyalty to the Debtor and its creditors when it failed to employ a sale process that would procure the maximum possible sale price and ensure the fullest extent of repayment of the Debtor's creditors.

183.    None of the Canadian Owners attempted to take any action to protect the interests of the Debtor or its creditors in the face of PJ and Tony Lampasona's self-dealing.

184.    Hartnell assisted PJ and Tony in arranging the sale to Kelly with the knowledge, consent and/or assistance of Bell and the other Canadian Owners.

185.    Soon after the corporate vote, the Debtor entered into an Asset Purchase Agreement with Rykor ("APA") whereby Rykor would purchase substantially all of the Debtor's assets for $448,000.

186.    The APA was executed by Kelly, as CEO of Rykor, and Hartnell, as CEO of the Debtor.

187.    On October 19, 2011, the Debtor filed the *Debtor's Motion (A) to Authorize Debtor to Effectuate Purchase and Sale Agreement with Rykor Concrete & Civil Inc.; (B) to Authorize Sale of Assets by Private Sale Free and Clear of Liens,*

27

*Claims and Interests; (C) to Authorize the Assumption and Assignment of*

*Executory Contracts, and (D) for Related Relief* ("Sale Motion") [Bankruptcy

Docket No. 17].

188.　Pursuant to the Sale Motion, the Debtor sought approval of the APA whereby

Rykor would purchase substantially all of the Debtor's tangible assets for a

purchase price of $448,000.

189.　Neither the Sale Motion nor the APA made any reference to repayment of the

Mary Lampasona Advance as a component of the proposed sale.

190.　Despite the Debtor's failure to disclose the contemplated repayment of the Mary

Lampasona Avance, the agreement to repay the Mary Lampasona Advance

continued to hold center stage in the Lampasonas' mind during the bankruptcy

sale process. For example, on October 25, 2011, Mary emailed PJ and stated,

"Just between you + I John DID say he was going to pay us at some point, right?"

PJ responded, "Right. He even mentioned it the other day that needed to get that

done."

191.　On December 30, 2011, the Court entered an order granting the Sale Motion and

approving the sale of the Debtor's assets to Rykor.

192.　Shortly thereafter, the Debtor and Rykor consummated the sale transaction set

forth in the Sale Motion and the APA.

193.　According to an email from Hartnell to Mary Lampasona on February 26, 2013,

Kelly decided he "wasn't happy with the deal" after the consummation of the sale

and that he was "rethinking" the deal and now planning to pay only $75,000.

194.　On May 16, 2013, PJ Lampasona emailed Hartnell, stating, "my parents have still

28

not been paid a dime" to which Hartnell responded, "Why not? Last you said John was paying $75k imminently."

## COUNT I

## Breach of Fiduciary Duty

## (All Canadian Owners and PJ Lampasona)

195.   Plaintiff incorporates ¶¶ 1 through 194 as though fully set forth herein.

### Hartnell

196.   As an officer and manager of the Debtor, Hartnell owed the Debtor and its creditors a duty of care, a duty of loyalty, and a duty of good faith and fair dealing.

197.   Hartnell breached his fiduciary duty to the Debtor on numerous occasions, including:

   a.   Causing or assenting to the Hartnell Transfers, despite his knowledge that the Debtor received no benefit from the transfers;

   b.   Causing or assenting to the JWL Transfers because of his personal interest in JWL;

   c.   Causing or assenting to various other transfers to or for the benefit of insiders while knowing that the Debtor received no benefit from the transfers;

   d.   Negotiating the sale to Rykor with the full knowledge that the sale would not be in the best interests of the Debtor or its creditors;

   e.   Voting in favor of the sale of the Debtor's assets to Rykor and Kelly with the full knowledge that the sale was not in the best interests of the Debtor

29

or its creditors;

    f.  Signing the APA on behalf of the Debtor with the full knowledge that the sale was not in the best interests of the Debtor and its creditors;

    g.  Personally arranging for and obtaining a commitment from Kelly to divert $150,000 of the sale price to Mary Lampasona;

    h.  Fraudulently failing to disclose Kelly/Rykor's $150,000 promise to pay Mary Lampasona;

    i.  Acting in the interests of his close friends, PJ Lampasona and Mary Lampasona, in negotiating the sale of the Debtor's assets; and

    j.  Failing to make any effort to obtain competing bids for the Debtor's assets.

198.  As a result of Hartnell's breach of his fiduciary duties, the Plaintiff is entitled to recover for the estate damages from Hartnell in an amount not less than $943,169.76.

### PJ Lampasona

199.  As an officer and manager of the Debtor, PJ Lampasona owed the Debtor and its creditors a duty of care, a duty of loyalty, and a duty of good faith and fair dealing.

200.  PJ Lampasona breached his fiduciary duty to the Debtor on numerous occasions, including:

    a.  Causing the Debtor to make fraudulent transfers to him;

    b.  Causing the Debtor to make fraudulent transfers to his friends or relatives, including the Hetzel Transfer, the Tony Lampasona Transfers, the

Margaret Lampasona Transfers, and the Hartnell Transfers;

c. Taking no action to prevent Tony Lampasona from wasting corporate assets by taking a trip to Las Vegas while the Debtor was seriously insolvent and completely unable to pay its creditors;

d. Conspiring with Tony Lampasona to convert assets of the Debtor by removing and concealing from Bank of Canton multiple items of collateralized equipment;

e. Converting corporate assets of the Debtor together with Tony Lampasona by removing and concealing multiple items of the Debtor's equipment;

f. Negotiating a sale of the Debtor's assets to Kelly with the intention of arriving at a sale price that would be as low as possible in order to allow for the success of the new company under the day to day management of himself and Tony Lampasona; and

g. Negotiating the repayment of Mary Lampasona's $150,000 advance by Kelly knowing that the payment was an integral part of the sale price that would not be paid to the Debtor.

201. As a result of PJ Lampasona's breach of his fiduciary duties, the Plaintiff is entitled to recover for the estate damages from PJ Lampasona in an amount not less than $943,169.76.

**Bell, Porter, Putnam, Stokdijk, and Smith**

202. Each of Bell, Porter, Putnam, Stokdijk, and Smith was a member and manager of the Debtor.

203. Each of Bell, Porter, Putnam, Stokdijk, and Smith held a duty of loyalty and a

31

duty of care to the Debtor.

204.    Each of Bell, Porter, Putnam, Stokdijk, and Smith was aware that the sale of the
        Debtor's assets to Rykor was collusive, yet took no action to protect the Debtor's
        interests.

205.    Each of Bell, Porter, Putnam, Stokdijk, and Smith was aware that PJ and Tony
        Lampasona were engaged in self-dealing in negotiating the sale of the Debtor to
        Rykor, yet took no action.

206.    Each of Bell, Porter, Putnam, Stokdijk, and Smith voted in favor of the sale of the
        Debtor's assets to Rykor with the full knowledge that the sale was not in the
        Debtor's best interests.

207.    Each of Bell, Porter, Putnam, Stokdijk, and Smith voted in favor of the sale of the
        Debtor's assets to Rykor with the intention of benefiting PJ Lampasona, Tony
        Lampasona, Lindsay, and JWL.

208.    Each of Bell, Porter, Putnam, Stokdijk, and Smith voted in favor the sale of the
        Debtor's assets giving little or no consideration to the interests of the Debtor's
        non-insider creditors.

209.    Each of Bell, Porter, Putnam, Stokdijk, and Smith actively engaged in obtaining
        fraudulent transfers from the Debtor to JWL.

210.    Each of Bell, Porter, Putnam, Stokdijk, and Smith actively engaged in attempts to
        obtain payment for JWL from the Debtor and to conceal those payments.

211.    Each of Bell, Porter, Putnam, Stokdijk, and Smith's actions and inactions
        constituted a breach of his duty of care to the Debtor.

212.    Each of Bell, Porter, Putnam, Stokdijk, and Smith's actions and inactions

constituted a breach of his duty of loyalty to the Debtor.

## COUNT II

### Fraud and Collusion in the Sale Process

### (Canadian Owners, PJ Lampasona, Rykor, and Kelly)

213.    Plaintiff incorporates ¶¶ 1 through 212 as though fully set forth herein.

214.    Each of the Canadian Owners, PJ Lampasona, Rykor, and Kelly (collectively, the
"Collusive Sale Defendants") failed to make required disclosure of all material
circumstances surrounding the proposed sale of the Debtor's assets to Rykor.

215.    This included the failure to disclose the real value obtainable by the Debtor for its
assets which included, at a minimum, the additional $150,000 that the Collusive
Sale Defendants secretly contemplated and directed be paid to Mary Lampasona
rather than to the Debtor's estate.

216.    The Bankruptcy Court and the Debtor's creditors relied on the disclosures made
by the Debtor and Collusive Sale Defendants in approving the Sale Motion and
authorizing the Debtor to consummate the proposed sale to Rykor.

217.    The Debtor and its creditors have suffered damages of at least $150,000 as a
result of the non-disclosure by the Collusive Sale Defendants of all material
circumstances surrounding the sale of the Debtor's assets to Rykor.

## COUNT III

### Conspiracy to Defraud Creditors Through Collusive Sale

### (Canadian Owners, PJ Lampasona, Rykor, and Kelly)

218.    Plaintiff incorporates ¶¶ 1 through 217 as though fully set forth herein.

219.    The Collusive Sale Defendants conspired to withhold from this Court and the

33

Debtor's creditors essential information concerning the proposed sale of the

Debtor's assets to Rykor, including the understanding that some of the

consideration to be paid for such assets would be paid to a non-Debtor party.  This

conspiracy harmed the Debtor and its creditors by depriving them of the

opportunity to obtain, or to seek to obtain, the full value of the Debtor's assets

that might have been obtained had the sale process been properly conducted.

## COUNT IV

### Unjust Enrichment Against Rykor and Kelly

220.    Plaintiff incorporates ¶¶ 1 through 219 as though fully set forth herein.

221.    Rykor and Kelly, acting as Rykor's principal, agreed to pay $150,000 to Mary
Lampasona as partial consideration for Rykor's proposed purchase of the
Debtor's assets, over and above the nominal APA purchase price of $448,000.

222.    Rykor has only paid $448,000 for the Debtor's assets.

223.    Neither Rykor nor Kelly made payment to Mary Lampasona on account of the
Mary Lampasona Advance.

224.    Rykor and Kelly, as Rykor's owner, has been unjustly enriched by Rykor's
payment of only $448,000 for the Debtor's assets.

225.    Plaintiff is entitled to recover from Rykor and Kelly, for the benefit of the Estate,
the amount by which they have been unjustly enriched, or $150,000.

## COUNT V

### Fraudulent Transfers to Steven and Lynn Hetzel

### [11 U.S.C. §§ 544, 550 and M.G.L. ch. 109A]

226.    Plaintiff incorporates ¶¶ 1 through 225 as though fully set forth herein.

34

227.    The Hetzel Transfer was made with actual intent to hinder, delay, or defraud one
        or more creditors to which the Debtor was or became, on or after the dates of the
        Hetzel Transfer, indebted.

228.    Specifically, but without limitation, the Debtor made the Hetzel Transfer knowing
        that:

        a.  It had no obligation to make it;

        b.  It received no consideration for it;

        c.  The Hetzel Transfer was made solely for the benefit of PJ Lampasona and
            Tony Lampasona, who were managers and officers of the Debtor;

        d.  The Hetzel Transfer caused or exacerbated the Debtor's insolvency.

229.    Additionally, the Debtor received less than reasonably equivalent value in
        exchange for the Hetzel Transfer, and the Debtor

        a.  Was insolvent on the date of the Hetzel Transfer, or became insolvent on
            the date of the Hetzel Transfer;

        b.  Was engaged or was about to engage in a business or transaction for
            which the remaining assets of the Debtor were unreasonably small in
            relation to the business or transaction; or

        c.  Intended to incur, or believed or reasonably should have believed that it
            would incur, debts beyond its ability to pay as they became due;

230.    At all times from and after July 1, 2008 through the Petition Date, the Bank of
        Canton, Leaf Financial, and other entities were creditors of the Debtor.

231.    The Plaintiff is entitled to recover the value of the Hetzel Transfer from Steven
        Hetzel and Lynn Hetzel as the initial transferees of the Hetzel Transfer.

35

## COUNT VI

### Fraudulent Transfers to JWL

### [11 U.S.C. §§ 544, 548 and 550 and M.G.L. ch. 109A]

232.    Plaintiff incorporates ¶¶ 1 through 231 as though fully set forth herein.

233.    The JWL Advances are properly characterized as equity, not debt.

234.    The JWL Transfers were made with actual intent to hinder, delay or defraud one
or more creditors to which the Debtor was or became indebted.

235.    Specifically, but without limitation, the Debtor made the JWL Transfers knowing
that:

      a.   It had no obligation to make them;

      b.   It received no consideration for them;

      c.   The JWL Transfers were made to an insider of the Debtor; and

      d.   The JWL Transfers caused and/or exacerbated its insolvency.

236.    Additionally, the Debtor received less than reasonably equivalent value in
exchange for each of the JWL Transfers, and the Debtor

      a.   Was insolvent on the date of each of the JWL Transfers, or became
insolvent on the date of such JWL Transfers;

      b.   Was engaged or was about to engage in a business or transaction for
which the remaining assets of the Debtor were unreasonably small; and/or

      c.   Intended to incur, or believed or reasonably should have believed that it
would incur, debts beyond its ability to pay as they became due.

237.    The JWL Transfers are avoidable as fraudulent transfers by the Trustee.

238.    The value of the JWL Transfers is automatically preserved for the benefit of the

36

Debtor's estate.

239. Pursuant to 11 U.S.C. § 548, the Plaintiff is entitled to recover the value of the JWL Transfers made during the two years before the Petition Date from JWL as the initial transferee of the JWL Transfers.

240. Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A, the Plaintiff is entitled to recover the value of the JWL Transfers made during the four years before the Petition Date from JWL as the initial transferee of the JWL Transfers.

## COUNT VII

### Fraudulent Transfers to American Express

### [11 U.S.C. §§ 544, 548, 550 and 551, and M.G.L. ch. 109A]

241. Plaintiff incorporates ¶¶ 1 through 240 as though fully set forth herein.

242. The Amex Transfers were made with actual intent to hinder, delay or defraud one or more creditors to which the Debtor was or became indebted.

243. Specifically, but without limitation, the Debtor made the Amex Transfers knowing that:

    a. It had no obligation to make them;

    b. It received no consideration for them;

    c. The Amex Transfers were made solely for the benefit of insiders of the Debtor;

    d. The Amex Transfers caused and/or exacerbated its insolvency.

244. Additionally, the Debtor received less than a reasonably equivalent value in exchange for each of the Amex Transfers and the Debtor

    a. was insolvent on the date that each of the Amex Transfers was made, or

37

became insolvent as a result of such Amex Transfer,

    b.  was engaged in a business, or was about to engage in a business, for which

        any property remaining with the Debtor was unreasonably small, and/or

    c.  intended to incur, or believed that it would incur, debts that would be

        beyond its ability to pay when due.

245.    The Amex Transfers are avoidable as fraudulent transfers by the Plaintiff.

246.    The value of the Amex Transfers is preserved for the benefit of the Estate.

247.    Pursuant to 11 U.S.C. § 548, The Trustee is entitled to recover the value of the

Amex Transfers made during the two years prior to the Petition Date from

American Express as the initial transferee of the Transfers.

248.    Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A , the Plaintiff is entitled to

recover the value of the Amex Transfers made during the four years before the

Petition Date from American Express as the initial transferee of the Amex

Transfers.

## COUNT VIII

### Fraudulent Transfers to Bank of America

### [11 U.S.C. §§ 544, 548, 550 and 551, and M.G.L. ch. 109A]

249.    Plaintiff incorporates ¶¶ 1 through 248 as though fully set forth herein.

250.    The BofA Transfers were made with actual intent to hinder, delay or defraud one

or more creditors to which the Debtor was or became indebted.

251.    Specifically, but without limitation, the Debtor made the BofA Transfers knowing

that:

    a.  It had no obligation to make them;

    b.  It received no consideration for them;

    c.  The BofA Transfers were made solely for the benefit of insiders of the Debtor;

    d.  The BofA Transfers caused and/or exacerbated its insolvency.

252.  Additionally, the Debtor received less than a reasonably equivalent value in exchange for each of the BofA Transfers and the Debtor

    a.  was insolvent on the date that each of the BofA Transfers was made, or became insolvent as a result of such BofA Transfers,

    b.  was engaged in a business, or was about to engage in a business, for which any property remaining with the Debtor was unreasonably small, and/or

    c.  intended to incur, or believed that it would incur, debts that would be beyond its ability to pay when due.

253.  The BofA Transfers are avoidable as fraudulent transfers by the Plaintiff.

254.  The value of the BofA Transfers is preserved for the benefit of the Estate.

255.  Pursuant to 11 U.S.C. § 548, the Plaintiff is entitled to recover the value of the BofA Transfers made during the two years prior to the Petition Date from Bank of America as the initial transferee of the Transfers.

256.  Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A, the Plaintiff is entitled to recover the value of the BofA Transfers made during the four years before the Petition Date from Bank of America as the initial transferee of the BofA Transfers.

## COUNT IX

### Fraudulent Transfer to Chase

**[11 U.S.C. §§ 544, 550, 551 and M.G.L. ch. 109A]**

257.    Plaintiff incorporates ¶¶ 1 through 256 as though fully set forth herein.

258.    The Chase Transfer was made with actual intent to hinder, delay or defraud one or more creditors to which the Debtor was or became indebted.

259.    Specifically, but without limitation, the Debtor made the Chase Transfer knowing that:

    a.  It had no obligation to make it;

    b.  It received no consideration for it;

    c.  The Chase Transfer was made solely for the benefit of insiders of the Debtor;

    d.  The Chase Transfer caused and/or exacerbated its insolvency.

260.    Additionally, the Debtor received less than a reasonably equivalent value in exchange for the Chase Transfer and the Debtor

    a.  was insolvent on the date that the Chase Transfer was made, or became insolvent as a result of such transfer,

    b.  was engaged in a business, or was about to engage in a business, for which any property remaining with the Debtor was unreasonably small, and/or

    c.  intended to incur, or believed that it would incur, debts that would be beyond its ability to pay when due.

261.    The Chase Transfer is avoidable as a fraudulent transfer by the Plaintiff.

262.    The value of the Chase Transfer is preserved for the benefit of the Estate.

263.    The Plaintiff is entitled to recover the value of the Chase Transfer from Chase as the initial transferee of the Chase Transfer.

40

## COUNT X

### Fraudulent Transfers to Hartnell

### [11 U.S.C. §§ 544, 548, 550 and 551, and M.G.L. ch. 109A]

264.   Plaintiff incorporates ¶¶ 1 through 263 as though fully set forth herein.

265.   The Hartnell Advance is properly characterized as equity, not debt.

266.   The Hartnell Transfers were made with actual intent to hinder, delay or defraud one or more creditors to which the Debtor was or became indebted.

267.   Specifically, but without limitation, the Debtor made the Hartnell Transfers knowing that:

    a.   It had no obligation to make them;

    b.   It received no consideration for them;

    c.   The Hartnell Transfers were made solely for the benefit of insiders of the Debtor;

    d.   The Hartnell Transfers caused and/or exacerbated its insolvency.

268.   Additionally, the Debtor received less than a reasonably equivalent value in exchange for each of the Hartnell Transfers and the Debtor

    a.   was insolvent on the date that each of the Hartnell Transfers was made, or became insolvent as a result of such Hartnell Transfers,

    b.   was engaged in a business, or was about to engage in a business, for which any property remaining with the Debtor was unreasonably small, and/or

    c.   intended to incur, or believed that it would incur, debts that would be beyond its ability to pay when due.

269.   The Hartnell Transfers are avoidable as fraudulent transfers by the Plaintiff.

41

270.   The value of the Hartnell Transfers is preserved for the benefit of the Estate.

271.   Pursuant to 11 U.S.C. § 548 , the Trustee is entitled to recover the value of the Hartnell Transfers made during the two years prior to the Petition Date from Hartnell as the initial transferee of the Transfers.

272.   Pursuant to 11 U.S.C. § 548, the Trustee is entitled to recover the value of the Amex Transfers, BofA Transfers, and/or NCFCU Transfers made during the two years prior to the Petition Date from Hartnell to the extent such transfers were made for the benefit of Hartnell.

273.   Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A, the Plaintiff is entitled to recover the value of the Hartnell Transfers made during the four years before the Petition Date from Hartnell as the initial transferee of the Hartnell Transfers.

274.   Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A, the Plaintiff is entitled to recover the value of the Amex Transfers, BofA Transfers, and/or NCFCU Transfers made during the four years prior to the Petition Date to the extent such transfers were made for the benefit of Hartnell.

## COUNT XI

### Fraudulent Transfers to PJ Lampasona

### [11 U.S.C. §§ 544, 548, 550, 551 and M.G.L. ch. 109A]

275.   Plaintiff incorporates ¶¶ 1 through 274 as though fully set forth herein.

276.   The PJ Lampasona Transfers were made with actual intent to hinder, delay or defraud one or more creditors to which the Debtor was or became indebted.

277.   Specifically, but without limitation, the Debtor made the PJ Lampasona Transfers knowing that:

    a.  It had no obligation to make them;

    b.  It received no consideration for them;

    c.  The PJ Lampasona Transfers were made solely for the benefit of insiders of the Debtor;

    d.  The PJ Lampasona Transfers caused and/or exacerbated its insolvency.

278.  Additionally, the Debtor received less than a reasonably equivalent value in exchange for each of the PJ Lampasona Transfers and the Debtor

    a.  was insolvent on the date that each of the PJ Lampasona Transfers was made, or became insolvent as a result of such PJ Lampasona Transfers,

    b.  was engaged in a business, or was about to engage in a business, for which any property remaining with the Debtor was unreasonably small, and/or

    c.  intended to incur, or believed that it would incur, debts that would be beyond its ability to pay when due.

279.  The PJ Lampasona Transfers are avoidable as fraudulent transfers by the Plaintiff.

280.  The value of the PJ Lampasona Transfers is preserved for the benefit of the Estate.

281.  Pursuant to 11 U.S.C. § 548, the Plaintiff is entitled to recover the value of the PJ Lampasona Transfers made during the two years prior to the Petition Date from PJ Lampasona as the initial transferee of the PJ Lampasona Transfers.

282.  Pursuant to 11 U.S.C. § 544, the Plaintiff is entitled to recover the value of the Amex Transfers, BofA Transfers, and/or NCFCU Transfers made during the two years prior to the Petition Date from PJ Lampasona to the extent such transfers were made for the benefit of PJ Lampasona.

43

283.   Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A, the Plaintiff is entitled to
recover the value of the PJ Lampasona Transfers made during the four years
before the Petition Date from PJ Lampasona as the initial transferee of the PJ
Lampasona Transfers.

284.   Pursuant to 11 U.S.C. § 544 and M.G.L. ch. 109A, the Plaintiff is entitled to
recover the value of the Hetzel Transfer from PJ Lampasona because the Hetzel
Transfer was made for his benefit.

### COUNT XII

### Preferential Payments to Hartnell

### [11 U.S.C. §§ 547, 550, and 551]

285.   Plaintiff incorporates ¶¶ 1 through 285 as though fully set forth herein.

286.   The Hartnell Transfers included transfers totaling $15,708.43 which were made
during the one year prior to the Petition Date.

287.   Hartnell was an insider of the Debtor.

288.   If the Hartnell Transfers during the one year prior to the Petition Date represented
payments of amounts due from the Debtor to Hartnell, then such payments:

    a.   were made to or for the benefit of a creditor of the Debtor;

    b.   were made for or on account of an antecedent debt owed by the Debtor
before such transfer was made;

    c.   were made while the Debtor was insolvent;

    d.   were made within one year prior to the Debtor's bankruptcy filing;

    e.   enabled Hartnell to receive more than it would have received if such
Hartnell Transfers had not been made, and Hartnell had received payment

on his debt to the extent provided by the provisions of the Bankruptcy

Code.

289.    The Plaintiff is entitled to recover the value of the Hartnell Transfers made during

the one year prior to the Petition Date from Hartnell.

290.    The Plaintiff is entitled to recover the value of the Amex Transfers, NCFCU

Transfers, and BofA Transfers made during the one year prior to Petition Date

from Hartnell to the extent such payments were on account of valid debts of the

Debtor and to the extent such payments were made for Hartnell's benefit.

## COUNT XIII

### Preferential Payments to PJ Lampasona

### [11 U.S.C. §§ 547, 550, and 551]

291.    Plaintiff incorporates ¶¶ 1 through 290 as though fully set forth herein.

292.    The PJ Lampasona Transfers included transfers totaling $18,275.55 which were

made during the one year prior to the Petition Date.

293.    PJ Lampasona was an insider of the Debtor.

294.    If the PJ Lampasona Transfers during the one year prior to the Petition Date

represented payments of amounts due from the Debtor to PJ Lampasona, then

such payments:

    a.   were made to or for the benefit of a creditor of the Debtor;

    b.   were made for or on account of an antecedent debt owed by the Debtor

       before such transfer was made;

    c.   were made while the Debtor was insolvent;

    d.   were made within one year prior to the Debtor's bankruptcy filing;

    e.   enabled PJ Lampasona to receive more than he would have received if

such PJ Lampasona Transfers had not been made, and PJ Lampasona had

received payment on his debt to the extent provided by the provisions of

the Bankruptcy Code.

295.    The Plaintiff is entitled to recover the value of the PJ Lampasona Transfers made

during the one year prior to the Petition Date from PJ Lampasona.

296.    The Plaintiff is entitled to recover the value of the Amex Transfers and BofA

Transfers made during the one year prior to Petition Date from PJ Lampasona to

the extent such payments were on account of valid debts of the Debtor and to the

extent such payments were made for PJ Lampasona's benefit.

## COUNT XIV

### Preferential Payments to American Express

### [11 U.S.C. §§ 547, 550, and 551]

297.    Plaintiff incorporates ¶¶ 1 through 296 as though fully set forth herein.

298.    The Amex Transfers included transfers totaling $13,663.68 which were made

during the 90 days prior to the Petition Date.

299.    If the Amex Transfers during the 90 days prior to the Petition Date represented

payments of amounts due from the Debtor to American Express, then such

payments:

    a.   were made to or for the benefit of a creditor of the Debtor;

    b.   were made for or on account of an antecedent debt owed by the Debtor

before such transfer was made;

    c.   were made while the Debtor was insolvent;

    d.   were made within 90 days prior to the Debtor's bankruptcy filing;

    e.   enabled American Express to receive more than it would have received if the Amex Transfers had not been made, and American Express had received payment on its debt to the extent provided by the provisions of the Bankruptcy Code.

300.    The Plaintiff is entitled to recover the value of the Amex Transfers made during the 90 days prior to the Petition Date from American Express.

## COUNT XV

## Alter Ego and/or Veil Piercing Against JWL

301.    Plaintiff incorporates ¶¶ 1 through 300 as though fully set forth herein.

302.    The Debtor did not observe corporate formalities.

303.    Lindsay did not observe corporate formalities.

304.    JWL's managers' meetings involved discussion and decisions regarding JWL's other affiliates, including the Debtor.

305.    The owners of JWL were instrumental to formation of the Debtor.

306.    The owners of JWL own (directly or indirectly) 75 percent of the equity interests in the Debtor.

307.    JWL provided some initial capitalization of the Debtor.

308.    The owners of JWL were responsible for the Debtor's inadequate capitalization.

309.    JWL caused Hartnell to become CEO of the Debtor.

310.    Prior to becoming CEO of the Debtor, Hartnell served as an officer of JWL.

311.    Upon leaving the Debtor's employ, Hartnell returned to JWL as an officer and employee.

312.    Hartnell remained a director of JWL during his employment with the Debtor.

313.    JWL considered the Debtor to be a division of JWL.

314.    As CEO of the Debtor, Hartnell pursued JWL's interests.

315.    JWL, Lindsay, and the Debtor commingled corporate funds.

316.    JWL referred to the Debtor as "our US operations" and "our New England

        offices."

317.    Intercompany transactions between the Debtor and JWL were not ordinary, arm's

        length transactions.

318.    JWL and the Canadian Owners siphoned the Debtor's corporate funds by

        extracting payments on account of equity contributions by JWL that were papered

        as loans but were intended as equity.

319.    The Debtor was merely a façade for the operations of JWL and the Canadian

        Owners, who operated as dominant stockholders of the Debtor through their

        control of Lindsay.

320.    JWL provided financial backing of certain of the Debtor's bids to obtain business.

321.    Because the owners of JWL caused the Debtor to be formed to promote JWL's

        interests, and failed to adequately capitalize the Debtor, the corporate separateness

        between JWL and the Debtor should be disregarded with respect to the acts and

        omissions of the Debtor that caused harm to the Debtor's creditors, under theories

        of alter ego and/or piercing the corporate veil.

322.    It would be unjust and unfair to treat JWL and the Debtor as distinct entities.

323.    The Debtor and JWL were alter egos, and JWL should be held responsible for all

        of the Debtor's debts.

48

324.    The corporate veil between JWL and the Debtor should be pierced and JWL

should be held responsible for all of the Debtor's debts.

## COUNT XVI

### JWL Liable for Acts and Omissions of Its Agent Hartnell

325.    Plaintiff incorporates ¶¶ 1 through 324 as though fully set forth herein.

326.    In his capacity as officer of the Debtor, Hartnell acted as JWL's agent.

327.    Because the owners of JWL caused Hartnell to be installed as CEO of the Debtor

for the purposes of promoting JWL's interests, and because Hartnell in that

capacity acted as agent for JWL, JWL is liable for damages caused to the Debtor

and its creditors as a result of Hartnell's acts and omissions as JWL's agent.

## COUNT XVII

### Aiding and Abetting Breaches of Fiduciary Duty

### (All Canadian Owners and PJ Lampasona)

328.    Plaintiff incorporates ¶¶ 1 through 327 as though fully set forth herein.

329.    If any of PJ Lampasona or the Canadian Owners did not owe a fiduciary duty to

the Debtor, Plaintiff pleads in the alternative that such individuals aided and

abetted the breaches of those managers who did have a fiduciary duty to the

Debtor, by knowingly and substantially participating in, permitting, and/or failing

to prevent the above-described actions of fiduciaries that caused harm to the

Debtor and its creditors.

## COUNT XVIII

### Aiding and Abetting Acts and Omissions of the Debtor and Hartnell

### (JWL)

330.   Plaintiff incorporates ¶¶ 1 through 330 as though fully set forth herein.

331.   To the extent that JWL is not liable for the acts and omissions of the Debtor
and/or Hartnell under theories of agency, alter ego or piercing the corporate veil,
Plaintiff pleads in the alternative that JWL aided and abetted the acts and
omissions of the Debtor and Hartnell at issue herein, by knowingly and
substantially participating in, permitting, and/or failing to prevent the above-
described acts and omissions of the Debtor and Hartnell.

## COUNT XIX

## Damages Under 11 U.S.C. §§ 363(n) and/or 105

## (Canadian Owners, JWL, PJ Lampasona, Rykor, and Kelly)

332.   Plaintiff incorporates ¶¶ 1 through 331 as though fully set forth herein.

333.   The Canadian Owners, PJ Lampasona, JWL, Rykor and Kelly were all potential
bidders to acquire the Debtor's assets.

334.   The acts and omissions of the Canadian Owners, JWL, PJ Lampasona, Rykor, and
Kelly constituted an agreement to control the sale price for the Debtor's assets,
and caused damage to the Debtor and its creditors in an amount of not less than
$150,000.

335.   Pursuant to 11 U.S.C. § 363(n), Plaintiff is entitled to recover from the Canadian
Owners, JWL, PJ Lampasona, Rykor, and Kelly (i) damages in an amount of not
less than $150,000, and (ii) Plaintiff's costs, attorneys' fees, and expenses
incurred in seeking such damages.

336.   The Canadian Owners, JWL, PJ Lampasona, Rykor, and Kelly's agreement to
control the purchase price for the Debtor's assets was made in willful disregard of

11 U.S.C. § 363(n).  Pursuant to 11 U.S.C. § 363(n), Plaintiff is entitled to recover punitive damages from such defendants and in such amounts as determined by this Court.

337.    In the alternative, the Plaintiff is entitled to an award of punitive damages against the Canadian Owners, JWL, PJ Lampasona, Rykor, and Kelly pursuant to 11 U.S.C. § 105.

**WHEREFORE**, the Trustee respectfully requests that the Court:

1.    With respect to Count I of the Complaint, enter judgment against the Canadian Owners and PJ Lampasona in an amount not less than $943,169.76;

2.    With respect to Count II, enter judgment against the Canadian Owners, PJ Lampasona, Rykor, and Kelly in an amount not less than $150,000;

3.    With respect to Count III, enter judgment against Canadian Owners, PJ Lampasona, Rykor, and Kelly in an amount not less than $150,000;

4.    With respect to Count IV, enter judgment against Rykor and Kelly in an amount not less than $150,000;

5.    With respect to Count V, enter judgment against Steven and Lynn Hetzel in the amount of $252,000;

6.    With respect to Count VI, enter judgment against JWL in an amount not less than $159,712.79;

7.    With respect to Count VII, enter judgment against American Express in an amount not less than $48,751.36;

8.    With respect to Count VIII, enter judgment against Bank of America in an amount not less than $94,724.90;

9.      With respect to Count IX, enter judgment against Chase in an amount not less than $11,681.05;

10.     With respect to Count X, enter judgment against Hartnell in an amount not less than $220,902.42;

11.     With respect to Count XI, enter judgment against PJ Lampasona in an amount not less than $231,089.66;

12.     With respect to Count XII, enter judgment against Hartnell in an amount not less than $58,776.34;

13.     With respect to Count XIII, enter judgment against PJ Lampasona in an amount not less than $61,343.46;

14.     With respect to Count XIV, enter judgment against American Express in an amount not less than $13,663.68;

15.     With respect to Count XV, enter judgment determining that JWL is liable for all of the Debtor's debts under theories of alter ego, veil piercing, and/or substantive consolidation;

16.     With respect to Count XVI, enter judgment determining that Hartnell is the agent of JWL and that JWL is liable for the acts and omissions of Hartnell as its agent for all damages flowing from such acts and omissions;

17.     With respect to Count XVII, to the extent the Court determines that any of the Canadian Owners and/or PJ Lampasona did not owe a fiduciary duty to the Debtor, enter judgment determining that such Canadian Owners and/or PJ Lampasona aided and abetted managers that did owe a fiduciary duty to the Debtor and are therefore liable for all damages flowing from such managers' breach of fiduciary duties;

52

18.      With respect to Count XVIII, to the extent the Court determines that JWL

is not liable for the acts and omission of the Debtor and/or Hartnell under theories of

agency, alter ego or piercing the corporate veil, enter judgment determining that the JWL

aided and abetted the acts and omissions of the Debtor and Hartnell and is therefore liable

for all damages flowing therefrom;

19.      With respect to Count XIX, enter judgment against the Canadian Owners,

JWL, PJ Lampasona, Rykor, and Kelly under 11 U.S.C. § 363(n) and/or § 105

determining that Plaintiff is entitled to judgment in an amount not less than $150,000,

plus costs, attorneys' fees, expenses, and punitive damages; and

20.      Grant such further and other relief as is just.


                                        Lynne F. Riley, Chapter 7 Trustee,
                                        by her attorneys,

                                        /s/ David Koha
                                        A. Davis Whitesell, BBO # 551462
                                        Lynne F. Riley, BBO #561965
                                        David Koha, BBO #679689
                                        Casner & Edwards, LLP
                                        303 Congress Street
                                        Boston, MA 02210
                                        (tel) 617-426-5900
                                        (fax) 617-426-8810

Dated: October 11, 2013